# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

**PATRICIA KAY QASEM,**

**Plaintiff,**

-vs-                                                    Case No.  **2:12-cv-596-FtM-29DNF**

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security[1],**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

Plaintiff, Patricia Kay Qasem, seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for Supplemental Security Income ("SSI") [2]. The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.  For the reasons set out herein, it is respectfully recommended that the decision of the Commissioner be **AFFIRMED**, pursuant to § 205(g) of the Social Security Act, 42 U.S.C § 405(g).

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted, therefore, for Commissioner Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Because the disability definitions for DIB and SSI are identical, cases under one statute are persuasive as to the other.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986); *McCruter v. Bowen*, 791 F.2d 1544, 1545 n.2 (11th Cir. 1986).

I.      **Social Security Act Eligibility, Procedural History, and Standard of Review**

The law defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d) (2); 20 C.F.R. §§ 404.1505-404.1511.

A.      **Procedural History**

On May 26, 2009, Plaintiff filed an application for SSI, alleging disability beginning March 1, 2009. (Tr. 13).  Plaintiff's claim was denied initially on September 16, 2009, and upon reconsideration on February 19, 2010. (Tr. 13).  Plaintiff filed a written request for a hearing on March 23, 2010. (Tr. 13).  An administrative hearing was held before Administrative Law Judge Frederick McGrath (the "ALJ") on January 19, 2011. (Tr. 26).  On February 18, 2011, the ALJ rendered his decision, in which he determined that Plaintiff has not been under a disability as defined in the Social Security Act since May 26, 2009, the date Plaintiff's application was filed. (Tr. 19-20).  Plaintiff's Request for Review of Hearing Decision was denied by the Appeals Council on September 9, 2012. (Tr. 1).

B.      **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion.  Even if the evidence preponderated against the Commissioner's findings, we must affirm if the decision reached is

supported by substantial evidence." *Crawford v. Comm'r.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). In conducting this review, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ, but must consider the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Martin v. Sullivan*, 894 F.2d 1329, 1330 (11th Cir. 2002); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). However, the District Court will reverse the Commissioner's decision on plenary review if the decision applied incorrect law, or if the decision fails to provide sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't. of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  The Court reviews de novo the conclusions of law made by the Commissioner of Social Security in a disability benefits case. Social Security Act, § 205(g), 42 U.S.C.A. § 405(g).

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920.  At step one, the claimant must prove that he is not undertaking substantial gainful employment. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001), *see* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is engaging in any substantial gainful activity, he will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(I).

At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments. *Doughty*, 245 F.3d at 1278, 20 C.F.R. § 1520(a)(4)(ii). If the claimant's impairment or combination of impairments does not significantly limit his physical or mental ability to do basic work activities, the ALJ will find that the impairment is not severe, and the claimant will be found not disabled. 20 C.F.R. § 1520(c).

At step three, the claimant must prove that his impairment meets or equals one of impairments listed in 20 C.F.R. Pt. 404, Sbpt. P. App. 1. *Doughty*, 245 F.3d at 1278, 20 C.F.R. § 1520(a)(4)(iii). If he meets this burden, he will be considered disabled without consideration of age, education and work experience. *Doughty*, 245 F.3d at 1278.

At step four, if the claimant cannot prove that his impairment meets or equals one of the impairments listed in Appendix 1, he must prove that his impairment prevents him from performing his past relevant work. *Id*. At this step, the ALJ will consider the claimant's RFC and compare it with the physical and mental demands of his past relevant work. 20 C.F.R. § 1520(a)(4)(iv), 20 C.F.R. § 1520(f) . If the claimant can still perform his past relevant work, then he will not be found disabled. *Id*.

At step five, the burden shifts to the Commissioner to prove that the claimant is capable of performing other work available in the national economy, considering the claimant's RFC, age, education, and past work experience. *Doughty*, 245 F.3d at 1278, 20 C.F.R. § 1520(a)(4)(v). If the claimant is capable of performing other work, he will be found not disabled. *Id*. In determining whether the Commissioner has met this burden, the ALJ must develop a full and fair record regarding the vocational opportunities available to the claimant. *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). There are two ways in which the ALJ may make this determination. The first is by applying the Medical Vocational Guidelines ("grids"), and the second is by the use of a vocational expert. *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004).  Only after the Commissioner meets this burden does the burden shift back to Claimant to show that he is not capable of performing the "other work" as set forth by the Commissioner. *Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

## II.      Review of Facts

### A.  Background Facts

Plaintiff was born on September 4, 1962, and was 48 years old at the time of the administrative hearing. (Tr. 28-29).  Plaintiff has a twelfth grade education. (Tr. 28).  Plaintiff has past relevant work experience as an office clerk. (Tr. 19).  Plaintiff testified that she cannot work because she has severe pain throughout her whole body. (Tr. 31).  Plaintiff suffers from fibromyalgia, obesity, asthma, chronic obstructive pulmonary disease, and status post bilateral knee replacement. (Tr. 15).

### B.  The ALJ's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since May 26, 2009, application date. (Tr. 15).  At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: (1) fibromyalgia, (2) obesity, (3) asthma, (4) chronic obstructive pulmonary disease, (5) pulmonary disease, and (6) status post bilateral knee replacement. (Tr. 15).  The ALJ found that the foregoing impairments are not *de minimis* and impose more than minimal functional restrictions on the Plaintiff's ability to perform the basic requirements of work. (Tr. 15).

At step three, the ALJ found that Plaintiff does not suffer from an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1. (Tr. 15).  Before proceeding to step four, the ALJ found that Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant cannot climb ladders, ropes, and scaffolds; cannot work around unprotected heights and dangerous machinery; needs a sit/stand option; can sit and stand for 30 minutes at a time; must avoid concentrated exposure to dust, gases, fumes, odors, and poor

ventilation; and is limited to occasional (up to 1/3 of the work day) climbing ramps/stairs, stooping, kneeling, crouching, and crawling." (Tr. 16). At step four, the ALJ found that Plaintiff's RFC did not preclude her from performing her past relevant work as an office clerk. (Tr. 19). As the ALJ found that Plaintiff could perform her past relevant work at step four, the ALJ concluded that Plaintiff was not disabled and made no findings at step five. (Tr. 19).

### C. Plaintiff's History and Medical Information

From July 28, 2005, to February 23, 2010, Plaintiff received treatment at the Family Health Centers of SW Florida. (Tr. 186-216, 400-411). On July 28, 2005, Plaintiff presented for a checkup following a motor vehicle accident. (Tr. 204). Nancy Buthman, ARNP noted that Plaintiff was unconscious for a few hours following the car accident, was very forgetful, and had pain in her neck. (Tr. 204). Plaintiff was diagnosed with asthma and musculoskeletal pain. (Tr. 204). Plaintiff was prescribed Flexeril, Albuterol, Ibuprofen, and Tramadol. (Tr. 204).

On April 18, 2006, Plaintiff presented with complaints of worsening body aches, fatigue, and blurry vision. (Tr. 201). Plaintiff was diagnosed with blurred vision, right knee pain, obesity, allergies, history of asthma, and arthralgias. (Tr. 203). On April 26, 2006, Plaintiff presented with complaints of low grade vision and blurry vision, dizziness, burning pain throughout her entire body, and knee pain. (Tr. 199). On May 23, 2006, Plaintiff underwent an MRI of the right knee which revealed diffuse interstitial tear involving the anterior cruciate ligament; minimal partial tear involving the medial collateral ligament; advanced degenerative signal with complex tear involving the medial meniscus; abnormal marrow edema within the proximal tibia and medial femoral condyle likely a combination of bone contusion and reactive degenerative changes; advanced osteoarthritic change; and moderate joint effusion. (Tr. 216). On December 20, 2006, Plaintiff presented for refills and complaints of pain in her right leg. (Tr.

197).  Dr. Shailaja Hegde noted that Plaintiff ambulated with a cane due to right leg pain associated with stiffness. (Tr. 198).

On March 15 and June 4, 2007, Plaintiff presented to Charles P. Springer, M.D., for follow-ups regarding her right total knee replacement. (Tr. 184, 185).  Dr. Springer noted that Plaintiff had a slow post-op rehab due to the fact that she did not get proper physical therapy after her procedure.  (Tr. 184).  Dr. Springer noted that Plaintiff was dealing with arthrofibrosis and has a burning quadricep pain when she is on her feet for quite a bit of time. (Tr. 189).  A physical examination of Plaintiff revealed that her right knee has a well healed surgical scar, that she has a range of motion from 0-110, that the knee is well aligned and well balanced, and that it was distally neurovascularly intact. (Tr. 189).

On July 13, 2007, Plaintiff presented to Dr. Hegde with complaints of fever, chills, and cough with yellow sputum. (Tr. 191).  Dr. Hegde diagnosed Plaintiff with hypertension and acute bronchititis. (Tr. 192).  On August 19, 2009, Plaintiff presented with left leg pain and was diagnosed with asthma, obesity, and diabetes. (Tr. 408-409).  On examination, Plaintiff weighed 274 pounds. (Tr. 408).  On September 16, 2009, Plaintiff presented with complaints of difficulty breathing. (Tr. 406).  Plaintiff reported that Advair did not seem to work as well as before. (Tr. 406).  On February 23, 2010, Plaintiff was diagnosed with hypertension, asthma, obesity, diabetes mellitus, depression, irregular periods, and fibromyalgia. (Tr. 403).

From May 28, 2008, to December 31, 2008, Plaintiff received treatment at the First Care Medical Care Centers. (Tr. 226-247).  Plaintiff presented with complaints of head congestion and left ear pain. (Tr. 226-247).  Lab results taken on May 28, 2008 revealed a high glucose level of 119 and hemoglobin A1C of 6.2. (Tr. 246-247).  Plaintiff was given a diagnosis of joint pain, hypertension, asthma gastroesophageal reflux disease (GERD), and morbid obesity. (Tr. 227).

Plaintiff was prescribed Trazodone, Motrin, Flexeril, Atenolol, Vicodin, HCTZ, Advair, Albuterol, and Allegra while under the care of the facility. (Tr. 227).

On August 27, 2008, Plaintiff presented for an initial patient consultation at the Orthopedic Center of Florida under the care of Dr. Mark E. Farmer. (Tr. 276-277).  Plaintiff complained of left knee pain, swelling, painful range of motion, burning, giving way sensations, popping, and cramping at night; and occasional numbness in foot when sitting on a stool. (Tr. 276).  A physical examination of Plaintiff revealed that she had an antalgic gait using a cane, moderate swelling and crepitus of the left knee, moderate medial tenderness, and occasional radiating pain to the calf. (Tr. 277-278).  Dr. Farmer diagnosed Plaintiff with meniscus tear, knee pain, and difficulty walking. (Tr. 278).

On October 21, 2008, Plaintiff was admitted to the Lee Memorial Health System with complaints of left knee pain since September 11, 2008, and subsequently underwent a left knee replacement. (Tr. 222-224).  She exhibited significant difficulty ambulating with chronic pain at which she was given Morphine to control the pain. (Tr. 22).  Plaintiff reported a history of significant trauma to her lower extremities at age 12, a right arthroscopic surgery done in 2001, bilateral wrist ganglion excision, left knee arthroscopy, right knee meniscectomy, two right knee arthroscopies, and a right total knee replacement. (Tr. 221).  She reported gaining significant weight over the years due to physical inactivity as a result of her knee pain. (Tr. 220).  She reported re-injuring her left knee on September 26, 2008 while walking into therapy where she slipped sideways. (Tr. 223).  Plaintiff was discharged from the Lee Memorial Health System on October 24, 2008, with a diagnosis of asthma, GERD, chronic obstructive pulmonary disease (COPD), and hypertension. (Tr. 222).

On November 3, 2008, Plaintiff returned to the Orthopedic Center of Florida. (Tr. 263). Dr. Farmer diagnosed Plaintiff with arthritis and osteoarthritis of the knee, status post surgery; meniscus tear of the medial meniscus posterior horn; difficulty walking; and swelling of the left limb. (Tr. 263-265). On January 2, 2009 Plaintiff presented with complaints of right wrist pain/strain. (Tr. 245-255). Dr. Sandra Collins noted that Plaintiff had a limited range of motion which was painful to move. (Tr. 254). Plaintiff reported that her symptoms were exacerbated with twisting, moving her wrist upwards, using her cane or walker, lifting and gripping. (Tr. 254-255). She reported a history of a ganglion cyst that was removed 3 years ago. (Tr. 254). On January 12, 2009 an MRI of the right wrist revealed fluid in the distal radioulnar joint which appeared to communicate with the radiocarpal joint with signal intensity in the central portion of the triangular fibrocartilage that was suggestive of a small tear in the central portion of the triangular fibrocartilage; post surgical artifact dorsal to the capitates bone; and trace fluid in the intercarpal articulations. (Tr. 282). On January 26, 2009, Dr. Farmer noted improvement in Plaintiff's left knee pain; however, Plaintiff continued to exhibit limited range of motion, selling in the knee and foot, and an antalgic gait. (Tr. 248-249).

From December 3, 2009, to December 14, 2010, Plaintiff was under the care of Dr. Van G. Rana for her leukocytosis. (Tr. 393). On her initial exam, Plaintiff ambulated with a walker and exhibited somewhat depressed mood. (Tr. 395). Plaintiff reported that Ibuprofen and Tramadol did not help her knee and ankle pain. (Tr. 395). On her final examination, Dr. Rana reported that Plaintiff's complete blood count (CBC) continued to show leukocytosis but it was not significantly worse. (Tr. 393). Plaintiff continued to complain of aches and pain. (Tr. 392).

On February 22, 2010, Dr. David Baldinger performed a rheumatology consultation. (Tr. 432-433). Plaintiff presented with joint pain, swelling, diffuse muscle skeletal pain, severe

osteoarthritis, and bilateral knee arthroplasties with complications in the left. (Tr. 432).  Dr.

Baldinger noted that Plaintiff was not able to extend and put full weight on her knee which

required use of a cane. (Tr. 432).  Her gait was predominantly on the right side.  (Tr. 432).  Dr.

Baldinger diagnosed Plaintiff with polyarticular joint pain and chronic pain secondary to

component of degenerative arthritis, hypermobility, fibromyalgia, and obesity. (Tr. 433).  On

March 17, 2010, Plaintiff reported that she did not have any benefit from Tramadol or

Gabapentin. (Tr. 430).  Plaintiff continued to experience diffuse pain. (Tr. 430).  Dr. Baldinger

noted a moderate amount of inflammation in the blood. (Tr. 430).  On April 15, 2010, Dr.

Baldinger noted that Plaintiff had persistent pain and mild to moderate elevation of inflammation

markers of questionable etiology. (Tr. 428).  On May 13, 2010, Plaintiff complained of itching

which Dr. Baldinger found was possibly from the codeine derivatives that she has for the diffuse

musculoskeletal pain. (Tr. 426).  On June 24, 2010, Dr. Baldinger reported that Plaintiff had

chronic elevation of the sedimentation rate of questionable etiology and presented with clinically

fibromyalgia like picture. (Tr. 424).  Plaintiff also complained of a poor quality sleep.  (Tr. 424).

On September 29, 2010, Plaintiff presented for refills of Venlafaxine and Hydrocodone-

Acetaminophen. (Tr. 422).  Dr. Baldinger noted that Plaintiff's weight was 280 pounds and

Plaintiff had the following medications: Advair, Ventolin, DuoNeb, Atenolol,

Hydrochrlorothiazide, Motrin, Flexeril, Tramadol, Vitamin D, Hydrocodone-Acetaminophen,

and Venlafaxine. (Tr. 422).  Dr. Baldinger diagnosed Plaintiff with chronic pain, polyarthralgia,

fibromyalgia with chronic elevation of inflammation, and parameters. (Tr. 422).

From April 21, 2010, to December 8, 2010 Plaintiff received treatment at Dr. Robert

Difronzo's office that specialized in family practice and internal medicine. (Tr. 378-390).  Dr.

Difronzo diagnosed Plaintiff with fibromyalgia, hypertension, COPD with asthma, and diffuse DDD. (Tr. 378-390).

On October 21, 2010, Plaintiff underwent x-rays of the cervical spine, lumbar spine, and the knees bilaterally. (Tr. 376-377). The x-ray of the cervical spine revealed early degenerative changes. (Tr. 376). The x-ray of the lumbar spine revealed mild degenerative changes. (Tr. 377). The x-rays of the knees bilaterally revealed mild diffuse demineralization with bilateral knee prostheses. (Tr. 376).

On October 25, 2011, Plaintiff presented to the Lee Memorial Health System for evaluation and treatment of fibromyalgia type symptoms. (Tr. 370). Plaintiff reported a history of myofascial pain for over 15 years that has progressively worsened. (Tr. 370). Plaintiff reported that her pain was located in the lumbar spine in between the shoulder blades, lower cervical spine, both shoulders, elbows, wrists as well as both knees and lower legs. (Tr. 370). Her pain was made worse with physical activity such as sitting for prolonged periods, standing, walking, bending, and being in the cold weather. (Tr. 370). She reported spending most of her days in bed. (Tr. 370). She also reported that her sleep was interrupted several times due to pain. (Tr. 370). Dr. Velmir A. Micovic noted that Plaintiff had tenderness to palpation along the lumbar, thoracic, and cervical musculature. (Tr. 371). She also exhibited difficulties walking and standing due to pain and obesity. (Tr. 371). Dr. Micovic diagnosed Plaintiff with lumbar degenerative disc disease, myofascial pain and spasm, and fibromyalgia. (Tr. 371). Dr. Micovic prescribed Baclofen. (Tr. 371).

**D. State Agency Evaluations**

On September 8, 2009, Plaintiff underwent an x-ray of her left knee at the Radiology Regional Center at the request of SSA. (Tr. 328). The x-ray revealed that the total knee

replacement arthroplasty was in good position and alignment. (Tr. 328).  There was discrete

cement material in the joint space localized at the popliteal fossa. (Tr. 328).

On September 15, 2009, Plaintiff underwent a consultative examination with Dr. Eshan

M. Kibria at the request of the SSA. (Tr. 330-334).  Dr. Kibria diagnosed Plaintiff with a history

of asthma, COPD, morbid obesity, and bilateral knee pain that was worse on the left. (Tr. 331).

Plaintiff reported that she had been suffering from COPD for 15 years in addition to knee pain.

(Tr. 330).  She reported that her leg gives out and her joint swells only allowing her the ability to

stand for 20 minutes and walk for about 500 feet. (Tr. 330).  She also reported experiencing

stiffness while sitting. (Tr. 330).  Dr. Kibria's physical examination revealed a visual acuity of

20/50 in both eyes. (Tr. 331).  Plaintiff had a positive straight leg raise at 70 degrees bilaterally

with limited range of motion of the lumbar spine, knees, ankles, and toes. (Tr. 331-333).  She

was not able to walk on both toes and heels. (Tr. 331).  Plaintiff exhibited diminished breath

sounds bilaterally during the respiratory exam. (Tr. 331).

One DDS file reviewing non-physician completed a report at the request of the SSA.  On

September 16, 2009, a DDS file reviewing non-physician, Leeann Summerford, completed a

RFC assessment at the request of the SSA. (Tr. 51-58).  Ms. Summerford reported that Plaintiff

had a diagnosis of bilateral knee pain (status post knee replacements), COPD, asthma, and

obesity. (Tr. 51).  Ms. Summerford checked that Plaintiff could lift/carry occasionally 20 pounds,

frequently 10 pounds, stand and/or walk about 2 hours in an 8 hour workday, sit about 6 hours in

an 8 hour workday, frequently climb ramps or stairs, frequently balance and crawl, occasionally

climb ladders, ropes, or scaffolds, occasionally stoop, kneel, or crouch, and should avoid

concentrated exposure to vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr.

52-55).  Ms. Summerford checked that Plaintiff had no limitations in push/pull, manipulative, visual, or communicative activities. (Tr. 52-55).

On February 19, 2010, Dr. P.S. Krishnamurthy completed a RFC assessment of Plaintiff at the request of the SSA. (Tr. 361-368).  Dr. Krishnaumaurty reported that Plaintiff had a diagnosis of COPD with a history of asthma and bilateral total knee arthroplasty. (Tr. 361).  Dr. Krishnaumurthy checked that Plaintiff could lift/carry occasionally 20 pounds, frequently 10 pounds, stand and/or walk about 2 hours in an 8 hour workday, occasionally climb ramps, stairs, ladders, ropes, or scaffolds, frequently balance, occasionally kneel, crouch, or crawl, and should avoid fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 361-365).  Dr. Krishnaumurthy checked that Plaintiff had no limitations in push/pull, manipulative, visual, or communicative activities. (Tr. 362-365).

### E.  Hearing Testimony

An administrative hearing was held before the ALJ on January 19, 2011. (Tr. 26-41). Plaintiff testified as follows.    Plaintiff testified that she was 48 years old and had a twelfth grade education but no vocational training. (Tr. 29-30).  Plaintiff testified that she is 5'6" tall and weighs 280 pounds. (Tr. 30).  Plaintiff testified that her normal weight fluctuates between 270 to 290 pounds. (Tr. 30).  Plaintiff testified that she has a driver's license but is unable to currently drive. (Tr. 30).  Plaintiff testified that the last time that she had driven was a couple of years prior to the hearing. (Tr. 31).

Plaintiff testified that she used to work as a cashier or in loss prevention. (Tr. 31). Plaintiff testified that her last job was in 2008 or 2009. (Tr. 31).  Plaintiff testified that she stopped working in March of 2009 because of severe pain throughout her whole body. (Tr. 31).

Plaintiff testified that the pain is the worst in her legs and back. (Tr. 31).  Plaintiff explained that she has fibromyalgia so the pain is everywhere throughout her body as well. (Tr. 31).

Plaintiff testified that she had two knee replacements. (Tr. 31).  Plaintiff testified that she had the first knee replacement in June of 2006 and the second knee replacement in October 2008. (Tr. 31-32).  Plaintiff testified that her knees still do not function properly and that she can stand for approximately 20 to 30 minutes. (Tr. 32).  Plaintiff testified that after that period of time her muscles become fatigued and that it causes her chronic pain. (Tr. 32).  Plaintiff testified that the pain is so bad that she has to sit down. (Tr. 32).  Plaintiff testified that she can sit down for about 20 to 30 minutes without having to constantly shift positions and change. (Tr. 32).  Plaintiff testified that she can walk approximately 500 feet and that she uses a cane all the time. (Tr. 32).  Plaintiff explained that her estimate that she could walk 500 feet was with a cane. (Tr. 32-33).

Plaintiff testified that she has a little bit of a problem bending her lower back and that she cannot squat or kneel. (Tr. 33).  Plaintiff testified that she can comfortably lift approximately 10 pounds. (Tr. 33).  Plaintiff testified that she struggles with ten-pound bags of potatoes. (Tr. 33).  Plaintiff testified that she has chronic breathing problems and that she is constantly getting sick. (Tr. 33).  Plaintiff testified that she has been diagnosed with asthma and chronic obstructive pulmonary disease. (Tr. 33).  Plaintiff testified that on a scale of one to ten, her daily chronic pain caused her pain above ten. (Tr. 33).  Plaintiff further stated that her pain is above a ten and is "twice your ten." (Tr. 34).  Plaintiff testified that she has a high tolerance for pain but the pain is so severe that all she thinks about "24/7" is finding a way to end her life. (Tr. 34).  Plaintiff testified that she has not received any psychiatric or psychological counseling. (Tr. 34).

Plaintiff testified that her main treating doctor is Robert Difronzo. (Tr. 34).  Plaintiff testified that she is currently seeing neurologists who are examining her to check for nerve

problems. (Tr. 34).  Plaintiff testified that she was also seeing a rheumatoid specialist, but that she had recently stopped because the specialist did not accept Plaintiff's new insurance. (Tr. 35). Plaintiff testified that she was diagnosed by Dr. Baldinger with fibromyalgia. (Tr. 35).  Plaintiff testified that is seeing a blood specialist because her blood work has been massively irregular for about five years. (Tr. 35).  Plaintiff testified that her white blood cell count keeps spiking, that her red cells drop and that other things are wrong with it. (Tr. 35).

Plaintiff testified that she takes numerous medications which have the side effect of causing her to be groggy. (Tr. 35).  Plaintiff testified that her medications also cause her to have difficulties focusing and remembering. (Tr. 36).  Plaintiff testified that she does not smoke, drink alcohol or have substance abuse issues. (Tr. 36).  Plaintiff testified that she doesn't really talk much to anyone except a single neighbor. (Tr. 36).  Plaintiff testified that she uses a stool for bathing and dressing and that she needs someone to be present when she is showering because she does not know when her legs will give out. (Tr. 37).  Plaintiff testified that she has to use the handicapped toilet and the handicapped shower stall. (Tr. 37).  Plaintiff testified that she has trouble sleeping, even when taking sleeping medication. (Tr. 37).

Plaintiff testified that she can only perform minimal household chores. (Tr. 37).  Plaintiff testified that she has not been able to perform cleaning because of her pain and that laundry is hard to do and takes her all day to do a load or two. (Tr. 37).  Plaintiff testified that she lives with a roommate in a house. (Tr. 38).  Plaintiff testified that she usually does the grocery shopping and uses an electric cart when she goes. (Tr. 38).  Plaintiff testified that her social activities have changed in recent years and that she could not attend her children's high school softball and basketball games and cannot attend church. (Tr. 38).  Plaintiff testified that she pushes herself to

do things but it ends up harming herself and causing her to be bedridden for three or four days. (Tr. 39).

Plaintiff testified that during a week she has a couple of halfway decent days, but no good days. (Tr. 39).  Plaintiff clarified that some of her days are tolerable and the rest of her days are spent in misery in her room. (Tr. 39).  Plaintiff testified that she watches television and that she wears the same clothing she wears to bed. (Tr. 39).  Plaintiff testified that she does not read as her eyes are bad. (Tr. 40).  Plaintiff testified that her condition is getting worse and that the strong pain medicine she is given is not helping much. (Tr. 40).

## II.    Specific Issues and Conclusions of Law

On appeal, Plaintiff raises the following issues: (1) whether the ALJ erred by failing to consider the impact of Plaintiff's obesity on her residual functional capacity, (2) whether the ALJ erred in finding that Plaintiff can perform the exertional demands of light work, given the un-rebutted evidence that Plaintiff uses a cane, (3) whether the ALJ erred by failing to consult with and elicit testimony from a vocational expert. (Doc. 16 p. 2-3).

### A.  Whether the ALJ erred by failing to consider the impact of Plaintiff's obesity on her residual functional capacity.

Plaintiff argues that the ALJ erred by failing to consider the impact of Plaintiff's obesity on her residual functional capacity. (Doc. 16 p. 14).  Plaintiff argues that the ALJ only cursorily mentions Plaintiff's obesity and failed to provide sufficient discussion and reasoning to enable judicial review. (Doc. 16 p. 16).  Defendant argues that the ALJ properly considered Plaintiff's obesity in combination with her other impairments when assessing her RFC. (Doc. 19 p. 5).

Social Security Ruling 02-01p instructs "adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including an individual's residual functional capacity." SSR 02-01p.

"Specifically, obesity can cause limitations in the exertional functions of sitting, standing, walking, lifting, carrying, pushing, and pulling; also, obesity can affect the postural functions of climbing, balancing, stooping, and crouching." *Estelle v. Astrue,* 2012 WL 4369296, *18 (July 31, 2012) (citations omitted).

In his decision, the ALJ provided that "[i]n accordance with Social Security Ruling 02-1p, the undersigned has considered the impact obesity has on limitation of function including the claimant's ability to perform routine movement and necessary physical activity within the work environment." (Tr. 18).   The ALJ concluded "that the claimant's obesity contributes to her functional limitations but does not result in limitations in excess of the residual functional capacity stated herein." (Tr. 18-19).   Additionally, the ALJ's opinion demonstrates that he considered Plaintiff's obesity in determining Plaintiff's RFC.  For example, the ALJ noted that Plaintiff's weight fluctuates between 270 to 290 pounds and that Plaintiff's straight leg raising was diminished to 70 degrees bilaterally due to her obesity. (Tr. 16, 17).  Thus, as the ALJ considered Plaintiff's obesity in determining Plaintiff's RFC, the Court finds that the ALJ did not err by failing to consider Plaintiff's obesity in determining her RFC.

### B.  Whether the ALJ erred in finding that Plaintiff can perform the exertional demands of light work, given the un-rebutted evidence that Plaintiff uses a cane.

Plaintiff argues that the ALJ erred by finding that Plaintiff can perform the exertional demands of light work given the un-rebutted evidence that Plaintiff uses a cane for ambulation. (Doc. 16 p. 17 ).  Specifically, Plaintiff argues that her use of a cane prevents her from performing the standing, walking, and lifting entailed in the performance of light work. (Doc. 16 p. 17).

Defendant responds that even though Plaintiff failed to cite any medical evidence showing that any physician ever prescribed her cane, the ALJ nevertheless found that Plaintiff

could only perform a limited range of light work. (Doc. 19 p. 5-6).  Specifically, Defendant notes

that the ALJ limited Plaintiff's RFC with the finding that Plaintiff required a sit/stand option and

that she can only sit and stand for 30 minutes at a time. (Doc. 19 p. 6).  Thus, Defendant argues,

notwithstanding that a cane was never prescribed to Plaintiff, the ALJ accounted for any sitting

and standing/walking limitations allegedly resulting from Plaintiff's usage of a cane. (Doc. 19 p.

6).

 In order to perform a full range of light work, a person must be capable of "standing or

walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10.

Here, the ALJ specifically noted that Plaintiff testified that "she can walk 500 feet, but always

uses a cane." (Tr. 16). The ALJ considered Plaintiff's testimony and concluded that Plaintiff had

the RFC to perform light work, except that Plaintiff

> . . . cannot climb ladders, ropes, and scaffolds; cannot work around unprotected
> heights and dangerous machinery; needs a sit/stand option; can sit and stand for
> 30 minutes at a time; must avoid concentrated exposure to dust, gases, fumes,
> odors, and poor ventilation; and is limited to occasional (up to 1/3 of the day)
> climbing ramps/stairs, stooping, kneeling, crouching, and crawling.

 (Tr. 16).  Thus, the ALJ found that Plaintiff could perform light work, but only to the extent that

Plaintiff's usage of a cane prevents her from performing the full range of light work.  Given

these RFC limitation findings, the Court finds that the ALJ did not err by finding Plaintiff could

work a limited range of light work.

### C.  Whether the ALJ erred by failing to consult with and elicit testimony from a vocational expert

Plaintiff argues that given the ALJ's assessment of Plaintiff's RFC, the ALJ was required

to consult with a vocational expert as to whether Plaintiff was capable of performing the

requirements of her past relevant work. (Doc. 16 p. 19).  Plaintiff argues that the ALJ is not a

vocational expert and is not qualified to conclude that the restrictions in Plaintiff's RFC do not

compromise her ability to perform her past relevant work as an office clerk. (Doc. 16 p. 20). Further, Plaintiff argues that the ALJ was required to consult with a vocational expert where, as in this case, the claimant's exertional limitations prevent the claimant from performing a full range of employment or when a claimant's non-exertional limitations limit basic work sills. (Doc. 16 p. 20).

Defendant responds that Plaintiff's argument is without merit because at step four, the burden is on claimant and an ALJ is not required to obtain VE testimony in determining that a claimant can perform her past relevant work. (Doc. 19 p. 9).  Further, Defendant argues that the ALJ complied with SSR 82-62 by properly comparing Plaintiff's RFC to the demands of her past relevant work. (Doc. 19 p. 9).

As discussed above, at step four in the five-step sequential evaluation, an ALJ will consider the claimant's RFC and compare it with the physical and mental demands of her past relevant work.  20 C.F.R. § 1520(a)(4)(iv), 20 C.F.R. § 1520(f).   If the claimant can still perform her past relevant work, then she will not be found disabled. *Id.*  Plaintiff bears the burden at step four of proving that she is unable to perform her past relevant work. *See Doughty v. Apfel,* 245 F.3d 1274, 1278-79 & n. 2 (11th Cir. 2001).

Although the regulations specifically provide for the utilization of a vocational expert in making the determination of whether a claimant can perform her past relevant work, there is no requirement that an ALJ must do so. *See, e.g.,* 20 C.F.R. § 404.1560(b)(2) ("… we *may* use the services of vocational experts or vocational specialist . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity") (emphasis added).  When an ALJ concludes that a claimant can perform her past relevant work, vocational expert testimony is not necessary. *Bliss v. Comm'r of Soc. Sec. Admin.,* 254

Fed.App'x 757, 758 (11th Cir. 2007) (citing *Lucas v. Sullivan,* 918 F.2d 1567, 1573 n.2 (11th Cir. 1990). Testimony from a vocational expert is relevant at the fifth step of the evaluation process, when the burden is on the ALJ to show that jobs exist in the national economy that the claimant can perform. *Id.* (citing *Wilson v. Barnhart,* 284 F.3d 1219, 1227 (11th Cir. 2002).

In this case, at step four, the ALJ considered the information provided to him and the Plaintiff's testimony and determined that Plaintiff is able to perform her past relevant work as an office clerk as it is actually and generally performed. (Tr. 19). Citing to the Dictionary of Occupational Titles 209.562-010, the ALJ correctly noted that Plaintiff's past relevant work as an office clerk is performed at a light exertional level and does not require climbing ladders, ropes, and scaffolds; working around unprotected heights and dangerous machinery; concentrated exposure to dust, gases, fumes, odors, and poor ventilation; and more than occasional (up to 1/3 of the work day) climbing ramps/stairs, stooping, kneeling, crouching, and crawling. (Tr. 19). In accordance with SSR 82-62, the ALJ determined Plaintiff's RFC, determined and discussed the physical and mental demands of Plaintiff's past relevant work, and found that Plaintiff's RFC would permit her to return to her past job. (Tr. 19). Accordingly, the Court does not find that the ALJ erred by failing to consult with or elicit testimony from a vocational expert.

IV.     **Conclusion**

The Court finds that the ALJ's decision is consistent with the requirements of the law and is supported by substantial evidence. Therefore,

**IT IS RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED.**

**Respectfully Recommended in Chambers, Fort Myers, Florida, this 11th day of February,**

**2014.**

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within fourteen days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.

The Court Requests that the Clerk of Court Mail or Deliver Copies of this Order to All Parties and All Counsel of Record